IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHARLES PHILLIPS

     Plaintiff,                              No. 2:09-cv-3266 GEB DAD P

  vs.

FISHERMAN, et al.

     Defendants.                      FINDINGS AND RECOMMENDATIONS

_____/

        Plaintiff is a state prisoner proceeding pro se with an action under 42 U.S.C. § 1983. In his complaint plaintiff alleges that while he was housed at the California Medical Facility (CMF), all five defendants named in this lawsuit were deliberately indifferent to a serious medical need – specifically, plaintiff's insomnia – in violation of his rights under the Eighth Amendment and that he was transferred out of CMF in retaliation for his filing internal grievances about his inadequate medical treatment in violation of his rights under the First Amendment. Defendants have moved for summary judgment on both claims.

I. Summary Judgment Standards

        The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) advisory

1

committee's note on 1963 amendments). Summary judgment is appropriate when the movant demonstrates that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita, 475 U.S. at 586. In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings. Instead, it must evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material – that is, that it might affect the outcome of the suit under the governing law. See Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  The opposing party must also demonstrate that the dispute is genuine, i.e., that the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987). The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Still, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted). See also Addisu v. Fred Meyer, 198 F.3d 1130, 1134 (9th Cir. 2000) ("A scintilla of evidence or evidence that is merely colorable . . . does not present a genuine issue of material fact" but rather there "must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion."); Hansen v. United States, 7 F.3d 137, 138 (9th Cir. 1993) ("When the non-moving party relies on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact.").

II. Undisputed Facts

Defendants' statement of undisputed facts is supported by citations to copies of plaintiff's medical records and sworn declarations by CMF Litigation Coordinator Weaver, Dr. Nachtwey, defendant Dr. Bick, defendant Dr. Fisherman, defendant Dr. Gallo, and defendant Dr. James.  The defendants' evidence on summary judgment establishes the following.

/////

/////

Each of the five defendants – Bick, Fisherman, Gallo, James and Turner – were employed as either a psychologist or psychiatrist at CMF during the events that comprise plaintiff's claims. (First Am. Complaint (Doc. 17) at 2-3, 6.)

The first medical record defendants submit is dated August 13, 2003. It contains plaintiff's claim to medical staff at CMF that "I haven't slept in over a year." (Mot. for Summ. J., Ex. A (Docket No. 53-5) at 2.) Plaintiff was examined that day by Dr. James (presumably the same Dr. James who is named as a defendant in this case), who noted that "[t]here is a [history] of behaviors all over the map, from behaving normally to psychotic-like with what appears to be marked delusional thinking (somatic delusions?). . . . It is difficult to determine fact from delusional/somatic fantasy." (Id.) Doctor James also noted that plaintiff "refuses" to take psychiatric medications. (Id.)

Plaintiff's extensive medical history at CMF shows that he would repeat his pattern of reporting severe insomnia for many years.[1] In this regard, back on June 15, 2004, plaintiff complained that he could not "get the medication I want for relief from this insomnia [and] the pain that I'm in 24 hours around the clock." (Id. at 4.) It was reported at that time that, however, that "[h]is presentation [was] inconsistent with what would be expected from someone who hasn't slept in weeks." (Id.) His "[s]peech [was] relevant [and] coherent as he trie[d] to make a case for getting Demerol." (Id.)

Despite the possibility of a psychosomatic condition, plaintiff was nonetheless treated by prison medical staff in various ways for a sleep disorder. He was prescribed Tamazepam for "chronic insomnia" in August 2006. (Id.) In November 2006, he was treated at an outpatient facility in San Pablo, California, as part of a sleep apnea study. (Id. at 9-10.) The study concluded that plaintiff's "treatment consideration" should be for "symptomatic mild

---

[1] Before July 21, 2007, plaintiff was housed in the Correctional Clinical Case Management System (CCCMS) at CMF. (First Am. Complaint (Doc. 17) at 6.) "CDCR" refers to the California Department of Corrections and Rehabilitation.

obstructive sleep apnea." (Id.) Two months later, Dr. Frank Hseuh requested that plaintiff receive Rozeram for "chronic insomnia." (Id. at 14.) Defendant Dr. Bick denied that request, stating "CDCR policy is that pharmacologic treatment of insomnia is to be done by the mental health clinicians." (Id.)

On March 17, 2007, Plaintiff began taking Ambien, pursuant to a prescription by a psychiatrist, Dr. Adler. (Id. at 15-17.) Dr. Adler noted that "as others have observed [plaintiff] doesn't appear sleepy or tired." (Id. at 15). Dr. Adler's assessment was that plaintiff suffered from a "delusional disorder." Less than two months later, Dr. James prescribed plaintiff Ativan, an anti-anxiety medication. (Id. at 20).

On July 21, 2007, plaintiff was placed in the Enhanced Outpatient Program (EOP) at CMF. According to Dr. Bick, "[t]he EOP provides the most intensive level of outpatient medical care within [CDCR's] Mental Health Delivery System." (Decl. of Dr. Bick (Docket No. 53-12), ¶ 4.) Three days later, on July 24, plaintiff met with defendant Dr. Turner, who wrote that plaintiff "[d]oes not appear tired." (Motion, Ex. A, Docket No. 53-5 at 22.) At that time Dr. Turner prescribed him Paxil "for depression." (Id.) Plaintiff also met with defendant Dr. Fisherman, a psychologist in the EOP, the same day. Her assessment, after consulting with plaintiff's clinician at CCCMS, was that "[t]his delusion about not sleeping for extended periods of time is fixed and he has made little or no improvement in his mental status. He has been resistant to treatment." (Id. at 23.)

On Jul 26, 2007, defendants Drs. Turner and Fisherman, along with two other prison mental health staffers, composed a mental health treatment plan for plaintiff. (Id. at 24-26.) The clinical summary states that plaintiff had "complained for years about an inability to sleep[,]" that he "reports not sleeping a single hour for 30 days consecutively[,]" and that he "physically looks well rested and his thought process is too organized to give credibility to his reports of not sleeping." (Id. at 24.) The treatment plan states that "[i]t is difficult to ascertain if his symptoms are secondary to a Delusional disorder, Factitious Disorder, or malingering." (Id.)

5

The plan states two objectives for plaintiff's treatment:

> [1.] Determine this inmate's motivation for always complaining that he "never sleeps" and refusing treatment despite verbalizing that he wants to remain in the mental health services program.
>
> [2.] Contain [inmate's] delusion about not sleeping and attempt to work within his delusional system to get him to program well.

(Id.) The treatment plan scheduled plaintiff for another evaluation after ninety days. (Id. at 26.)

Plaintiff met with defendant Dr. Gallo at least three times between August 1 and August 14, 2007. (Id. at 27-28, 30.) On August 14, she wrote that plaintiff "appears to be delusional ... or is malingering." (Id. at 30.)

Plaintiff met with defendant Drs. Turner or Fisherman at least twelve times for evaluations between August 13 and October 25, 2007. (Id. at 30, 32-42.) On October 22, defendant Dr. Fisherman recorded that plaintiff became defensive and angry "after being confronted with the possibility of his level of care being changed due to his not benefitting from EOP." (Motion, Ex. A, Doc. 53-6 at 15.) Dr. Fisherman wrote that "this interaction suggests that [plaintiff] may be motivated by external incentives for his reports of not sleeping (i.e., avoid dorm living at the CCCMS [location].) . . . Further, he has not cooperated with treatment suggestions at the EOP level." (Id.)

On October 25, 2007, the team assigned to plaintiff at EOP determined he should be re-assigned to the CCCMS facility. (Id. at 43-46.) Plaintiff's complaints of having not slept in a month continued. (Id. at 22.) There were several periods in 2008 during which he did not cooperate in taking his prescribed medication, Trazodone, an anti-depressant and hypnotic for sleeplessness. (Id. at 23-25; Decl. of Dr. Nachtwey (Doc. 53-11) at ¶ 10.)

On September 3, 2008, plaintiff underwent a CT brain scan for chronic insomnia, headaches and a head trauma he had suffered in 1985. (Id. at 28.) The findings of that scan were normal. His complaints of severe insomnia continued. He returned to the outpatient facility in San Pablo on November 24, 2008. (Motion, Ex. A., Doc. 53-7 at 6-8.) His primary physician

6

there, Dr. Nachtwey, concluded that plaintiff had "significant sleep-disordered breathing" and recommended uses of a CPAP machine. (Nachtwey Decl. ¶ 3.)  Plaintiff was provided a CPAP machine on January 7, 2009. (Doc. 53-7 at 10.) CMF medical officials issued it to him permanently on January 14, 2009. (Id. at 13.)

At a follow-up examination on April 27, 2009, Dr. Nachtwey found that plaintiff's treatment had improved his sleep but suggested plaintiff would benefit from additional medication, namely Ambien. (Id. at 14; Nachtwey Decl. ¶ 4.) However, Ambien was non-formulary at CMF. (Nachtwey Decl. ¶ 4.) Defendant Dr. James prescribed Elavil for plaintiff on August 13, 2009. (Doc. 53-7 at 15.) Dr. James increased the Elavil dosage after plaintiff claimed he had only slept four hours in a week; however, Dr. James recorded that he thought plaintiff was delusional. (Id. at 16.)

On August 20, 2009, plaintiff appeared before a Unit Classification Committee (UCC) at CMF for his annual program review. (Decl. of J. Weaver, Ex. B (Doc. 53-10) at 2.) The UCC's review found that plaintiff had committed three prison disciplinary offenses, thus increasing his inmate classification level from III to IV. (Weaver Decl. ¶¶ 5-6.) Based on his increase to a Level IV classification, the UCC recommended plaintiff's transfer out of CMF, which houses Level I-III inmates only. (Id. at ¶ 7.) Plaintiff was eventually relocated to California State Prison-Sacramento.

Following that transfer, plaintiff's complaints about insomnia persisted.  He returned for a follow-up examination on December 14, 2009 and at that time Dr. Nachtwey stated his impression that plaintiff's ongoing complaints "[are] probably sleep state misperception." (Id. at 19.) When plaintiff told Dr. Nachtwey that he wanted a second opinion, Dr. Nachtwey wrote merely "I think [that ] is probably a very good idea." (Id.)

Plaintiff has filed an opposition to the pending motion for summary judgment that, with exhibits, spans a total of 467 pages. (Docket No. 58.) The submission includes a declaration from plaintiff which merely introduces his voluminous medical records and

inmate grievance history regarding his still ongoing claims of untreated insomnia attached thereto. (Docket No. 58-2.)[2]

III. Analysis of plaintiff's claims

As noted at the outset, plaintiff alleges that defendants have been deliberately indifferent to his serious medical condition of insomnia. He also claims he was transferred out of CMF for filing both this action and inmate grievances regarding the medical treatment he was receiving. (First Am. Complaint, additional p. 9.) Below, the court will address defendants' motion for summary judgment as it relates to each claim.

    A. Deliberate indifference to a serious medical need

In Estelle v. Gamble, 429 U.S. 97, 105-06 (1976), the Supreme Court held that negligent medical care of a prisoner does not comprise a constitutional violation under the Eighth Amendment. Instead, medical care does not amount to cruel and unusual punishment unless the mistreatment rose to the level of "deliberate indifference to serious medical needs." Id. at 106. The Ninth Circuit has developed a two-part test for assessing claims of deliberate indifference:

> First, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." Second, the plaintiff must show the defendant's response to the need was deliberately indifferent. This second prong – defendant's response to the need was deliberately indifferent – is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. Indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care.

Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations and quotations omitted).

---

[2] On August 21, 2012, plaintiff was, contemporaneous with the filing of defendants' pending motion for summary judgement, advised by the court of the requirements for opposing such a motion pursuant to Fed. R. Civ. P. 56 in keeping with the holdings in Woods v. Carey, 684 F.3d 934 (9th Cir. 2012), Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988). (Docket No. 55.)

See also McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir.1992), overruled in part on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir.1997).

A medical need is serious if failure to treat the condition could cause further significant injury or the unnecessary and wanton infliction of pain. McGuckin, 974 F.2d at 1059.

> The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a "serious" need for medical treatment.

Id. at 1060. On the second element of a deliberate indifference claim – "the nature of the defendant's response" – the Ninth Circuit has observed that "the fact that an individual sat idly by as another human being was seriously injured despite the defendant's ability to prevent the injury is a strong indicium of callousness and deliberate indifference to the prisoner's suffering." Id. at 1060. "A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established." Id. (emphasis added).

There is no Eighth Amendment violation if a delay in medical treatment is not harmful. Shapely v. Nevada Bd. of State Prison Com'rs., 766 F.2d 404, 407 (9th Cir.1985). However, unnecessary continuation of pain may constitute the "harm" necessary to establish an Eighth Amendment violation from delay in providing necessary medical care. McGuckin, 974 F.2d at 1062.

In moving for summary judgment in their favor defendants argue first that one who suffers from insomnia does not present a serious medical need. Next, defendants contend that even if insomnia is a serious medical condition, the undisputed evidence before the court establishes that they were not deliberately indifferent to plaintiff's condition but indeed repeatedly attempted to treat his insomnia despite indications that his complaints of lack of sleep were delusional. The court need not rule on the question of whether insomnia presents a serious

medical need in the Eighth Amendment context. This is because defendants' second argument, that there is no evidence before the court on summary judgment on which any of them could be found to have been deliberately indifferent to that condition, is well-taken. Very simply, the evidence submitted by both parties on summary judgment establishes that all of the defendants responded to plaintiff's constant complaints that he could not sleep, even after (or especially after) the duration of sleeplessness claimed by plaintiff became physically impossible. Plaintiff was prescribed medications, counseled, referred for outpatient treatment and follow-up examinations, and provided with a mechanical sleep aid by the defendants. Defendants' attention to plaintiff's complaints has been extensively documented by both parties, and there is simply no evidence before the court that any defendant denied, delayed or intentionally interfered with plaintiff's medical care.

Plaintiff's opposition to the pending motion for summary judgment focuses principally on Dr. Nachtwey's involvement in his treatment, alleging both that Dr. Nachtwey has covered up for the defendants' failure to treat him properly or that CMF harmed plaintiff by not following Dr. Nachtwey's recommendation that plaintiff be prescribed Ambien for sleep.[3] Here, the record establishes a rational justification in every instance where one doctor did not follow another doctor's recommendation in connection with plaintiff's condition. At worst, the evidence suggests now more than a difference of opinion between two doctors or between a doctor and plaintiff. Of course, a mere difference of opinion about the proper course of treatment is not deliberate indifference, nor does a dispute between a prisoner and prison officials over the necessity for or extent of medical treatment amount to a constitutional violation. See, e.g.,

---

[3] Dr. Nachtwey is not a named defendant in this civil rights action. However, defendants have submitted Dr. Nachtwey's declaration in support of their motion for summary judgment. Therein Dr. Nachtwey states that Ambien is a hypnotic medication used to treat sleeplessness and, like all hypnotic sleep medications has the "potential to create dependency in the user." (Nachtwey Decl. ( Doc. No. 53-11) at 2-3.) He was not aware that Ambien was non-formulary at CMF when he recommended that plaintiff receive a short trial of the drug in connection with his complaints of insomnia. (Id. at 2.)

Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir.1989).

Defendants have met their burden of coming forward with evidence in support of their motion for summary judgment. Plaintiff has not presented any evidence rebutting defendants' evidence. In fact, in large part, plaintiff relies on the same evidence, his own medical records. The defendants' have established their entitlement to summary judgment in their favor as to plaintiff's claim for deliberate indifference to a serious medical need and their motion should be granted in that respect.

B. Plaintiff's retaliation claim

Retaliation by a state actor for the exercise of a constitutional right is actionable under certain circumstances. See Mt. Healthy City Bd. of Education v. Doyle, 429 U.S. 274, 283-84 (1977). In the prison context, a plaintiff must show: (1) that a state actor took some adverse action against him (2) because of (3) the prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal. Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir.2005); see also Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995); Barnett v. Centoni, 31 F.3d 813, 815-16 (9th Cir. 1994). A prisoner does not establish a claim of retaliation merely by showing a prison official's adverse action against him after he did something within his constitutional rights. He must establish a nexus between the two. See Huskey v. City of San Jose, 204 F.3d 893, 899 (9th Cir.2000) (A retaliation claim cannot rest on the logical fallacy of *post hoc, ergo propter hoc*, literally, "after this, therefore because of this.")

Here, plaintiff has presented no evidence even suggesting a nexus between the defendants and plaintiff's transfer out of CMF. Rather, the only evidence before the court on summary judgment establishes that plaintiff was transferred solely because his security classification was increased. His security classification went up because he committed three prison disciplinary offenses within a year, none of which concerned the defendants named in this

11

action. The UCC's decision to transfer plaintiff makes no reference to any of the defendants. Most importantly, the evidence submitted in connection with the pending summary judgment motion shows that other correctional officers, none of them doctors, sat on the committee that recommended plaintiff's transfer. There is simply no evidence before the court suggesting that any of the defendants was involved in any way in the UCC's decision to transfer plaintiff. Therefore, defendants are entitled to summary judgment in their favor with respect to plaintiff's retaliation claim as well.

IV.  Conclusion

        Accordingly, IT IS RECOMMENDED that defendants' motion for summary judgment (Docket No. 53) be granted on all claims as to all defendants and this action be dismissed with prejudice.

        These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: March 18, 2013.

                                                /s/ Dale A. Drozd
                                                DALE A. DROZD
                                                UNITED STATES MAGISTRATE JUDGE

hm
phil3266.57